# United States Court of Appeals
## for the
## Seventh Circuit

MONETTE E. SACCAMENO,

*Plaintiff-Appellee,*

— v. —

U.S. BANK NATIONAL ASSOCIATION, as trustee for C-BASS MORTGAGE
LOAN ASSET-BACKED CERTIFICATES, Series 2007 RP1,
and OCWEN LOAN SERVICING, LLC,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
NO. 1:15-CV-01164
THE HONORABLE JOAN B. GOTTSCHALL

## RESPONSE BRIEF OF MONETTE E. SACCAMENO

Nicholas H. Wooten
NICK WOOTEN, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
(833) 937-6389
nick@nickwooten.com

*Attorney for Plaintiff-Appellee*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 19-1569

Short Caption: Saccameno v. U.S. Bank and Ocwen Loan Servicing

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Monette Saccameno

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Nick Wooten for Nick Wooten, LLC

Mohammad Badwan for Sulaiman Law Group

Ross Zambon for Zambon Law, LTD.

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/ Nick Wooten          Date: 7/18/2019

Attorney's Printed Name: Nick Wooten

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** X   **No** _____

Address: 5125 Burnt Pine Drive Conway, Arkansas, 72034

Phone Number: 833-937-6389          Fax Number:

E-Mail Address: nick@nickwooten.com

rev. 01/15 GA

# TABLE OF CONTENTS

Table of Contents ............................................................................................ i

Table of Authorities ...................................................................................... iii

APPELLEE'S JURISDICTIONAL STATEMENT ....................................... 1

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE FROM THE RECORD EVIDENCE ........... 2

STATEMENT OF THE STANDARD OF REVIEW .................................. 16

SUMMARY OF THE ARGUMENT .......................................................... 17

ARGUMENT ............................................................................................... 21
   I.   Any Reasonable Jury Would Award Punitive Damages on Ms.
       Saccameno's ICFA Claim ................................................................ 21

      A. Ocwen's Conduct Satisfies The Standard For The Imposition of Punitive
         Damages .......................................................................................... 22
         i.  Nothing Ocwen Did after July 23, 2013 Could Be Blamed On "Marla's
            Mistake" .................................................................................. 24
         ii. The Record is Rife With Ocwen's Knowledge of Wrongdoing and
            Intentional Actions in Defiance of the Bankruptcy Discharge Order .. 25
         iii. Ocwen Indisputably Had Longstanding Corporate Knowledge of the
            Types of Problems That Caused Ms. Saccameno Harm ....................... 25

      B. Ocwen Engaged in Materially Deceptive Conduct. ................................... 27

      C. Ocwen Intentionally Disobeyed Multiple Valid Court Orders and Legal
         Obligations to Cause Ms. Saccameno Harm ............................................ 27

      D. "Marla's Mistake" Inured to Ocwen's Benefit and Allowed Ocwen's System
         to Reengage its Automated Collections Processes ...................................... 31
         i.  "Miscoding" Ms. Saccameno's Loan Allowed Collections to Resume.... 32
         ii. "Miscoding" Ms. Saccameno's Loan Allowed Foreclosure to Resume .. 32
         iii. Reasonable Inference of Intent to Harm ................................................ 33

      E. Ocwen Also Tried to "Cook the Books" with Its Payment History. ........... 33
         i.  Ocwen Cannot Count to 42 ................................................................. 33

      F. Ocwen's Offers of Loan Modification Are Further Evidence Of An Intent to
         Profit Illegally ............................................................................................ 34

    G. Ocwen's Arguments Regarding Deliberate Corporate Participation Are Both Waived and In Contravention of the Law of the Case....................... 34

II.   Punitive Damages are Proper and the Amount Awarded Is Well Within Constitutional Limits .................................................................... 35

   A. The Disparity Between the ICFA Compensatory Damages Award and Punitive Damages is Not Irrational ........................................... 37
     i.   Ocwen's Argument that Due Process Requires a "Claim by Claim" Analysis Rather than Aggregation Misses the Mark. ........................... 37
     ii.  Ocwen's Due Process Argument for Claim by Claim Method Does Not Have to be Decided.................................................................. 38
        a.  Ocwen Agreed that the Compensatory Damages Would be Totaled by the Court............................................................. 39
        b.  The Application of Estoppel is Also Appropriate to Prevent a Perversion of Justice................................................................43
     iii. Discussion of Ocwen's Constitutional Analysis.................................... 44
     iv. Ocwen's Ratio Arguments at Points 3 and 4 Continue to Miss the Point ............................................................................. 45

   B. Ocwen's Conduct Was Reprehensible........................................ 47
     i.   Ms. Saccameno Suffered Physical Harm ................................. 48
     ii.  Ocwen's Conduct Evinced an Indifference to or Reckless Disregard of the Health and Safety of Others ............................................. 48
     iii. Ms. Saccameno was Financially Vulnerable ....................................... 49
     iv. Ocwen's Conduct Involved Repeated Actions ......................................... 49
     v.  Ms. Saccameno's Harm was the Result of Intentional Malice, Trickery or Deceit.................................................................................. 51

   C. Civil Penalties Are Comparable To The Punitive Damages Award .......... 51

   D. Ocwen Cannot Define the Constitutional Limit of Punitive Damages ..... 54

CONCLUSION.................................................................................... 55

CERTIFICATE OF COMPLIANCE......................................................... 56

CERTIFICATE OF SERVICE................................................................. 57

# TABLE OF AUTHORITIES

**Cases**

*Adams v. City of Chi.,*
798 F.3d 539 (7th Cir. 2015) ................................................................ 19, 54

*Beard v. Wexford Health Sources, Inc.,*
900 F.3d 951 (7th Cir. 2018) ......................................................... 19, 37, 54

*Blount v. Stroud,*
395 Ill. App. 3d 8, 27 (2009) ..................................................................... 35

*BMW of N. Am. v. Gore,*
116 S. Ct. 1589, 1599 (1996)........................................................ 17, 50, 51

*Boim v. Holy Land Found. for Relief & Dev.,*
549 F.3d 685, 692 (7th Cir. 2008) ............................................................ 26

*Boyd v. Tornier, Inc.,*
656 F.3d 487, 497 (7th Cir. 2011) ............................................................ 26

*Brash v. PHH*
*(U.S.D.C., M.D. Georgia Case No. 4-09-CV-146 (CDL) March 21, 2011)*................... 54

*Cont'l Trend Res. v. Oxy USA,*
101 F.3d 634, 642 (10th Cir. 1996) .......................................................... 36

*Daugherty v. Ocwen Loan Servicing, LLC,*
*2016 U.S. Dist. LEXIS 159586, at *3 (S.D. W. Va. Oct. 12, 2016)* ............................ 53

*Daugherty v. Ocwen Loan Servicing, LLC,*
701 F. App'x 246, 261 (4th Cir. 2017) ...................................................... 54

*David v. Caterpillar, Inc.,*
324 F.3d 851, 858 (7th Cir.2003) ............................................................. 16

*Duran v. Town of Cicero,*
653 F.3d 632, 640 (7th Cir. 2011) ....................................................... 39, 41

*Escamilla v. Jungwirth,*
426 F.3d 868, 870 (7th Cir. 2005) ............................................................... 27

*Frey Corp. v. City of Peoria,*
 735 F.3d 505, 509 (7th Cir. 2013) ................................................... 22, 34, 46

*Guzman v. Ocwen Federal Bank, et al.*
 (03-CV-61011-2, Nueces County, TX) .......................................................... 53

*Hammer v. Residential Credit Solutions, Inc.,*
2015 U.S. Dist. LEXIS 162636, (N.D. Ill. 2015) ........................................ 53

*Hunt v. Chi. Hous. Auth.,*
1992 U.S. App. LEXIS 20161, at *36 (7th Cir. Aug. 19, 1992)...................... 22, 34, 47

*In re Baca,*
2012 Bankr. LEXIS 5874, *13-14 (Bankr. D.N.M. Dec. 20, 2012) ............................. 29

*In re Cassidy,*
892 F.2d 637, 642 (7th Cir. 1990) ................................................................ 43

*In re Gravel,*
556 B.R. 561, 568 (Bankr. D. Vt. Sept. 12, 2016)........................................ 29

*In re Marriage of Marr,*
202 Ill. Dec. 657, 660, (1994) ...................................................................... 42

*In re Thibeault,*
2015 Bankr. LEXIS 3432, *4-6 (Bankr. D. Me. Oct. 8, 2015)........................ 29

*Int'l Union of Operating Eng'rs, Local 150 v. Lowe Excavating Co.,*
225 Ill. 2d 456, 490 (2006) .......................................................................... 35

*Kirkpatrick v. Strosberg,*
385 Ill. App. 3d 119, 136 (2008) ........................................................... 35, 51

*Link v. Wabash R.R. Co.,*
82 S. Ct. 1386, (1962)............................................................................ 21, 42

*Linza v. PHH*
(Yuba County, CA, July 18, 2014)............................................................... 54

*Maness v. Meyers,*
419 U.S. 449, 458 (1975).......................................................................... 27, 47

*Marshall v. Teske,*
284 F.3d 765, 770 (7th Cir. 2002) ............................................................... 51

*Mathias v. Accor Econ. Lodging, Inc.,*
347 F. 3d 672, (7th Cir. 2003) ...................................................... 17, 35, 46

*McGinnis v. Am. Home Mortg. Servicing, Inc.,*
901 F.3d 1282, 1287 (11th Cir. 2018) ....................................................... 53

*McKinnon v. City of Berwyn,*
750 F.2d 1383 (7th Cir. 1984) ....................................................... 19, 46, 54

*McRoberts Software, Inc. v. Media 100, Inc.,*
329 F.3d 557, 569 (7th Cir. 2003) ............................................................ 21, 47

*Molnar v. Booth,*
229 F.3d 593, 597 (7th Cir. 2000) .............................................................. 16

*Norman v. Deutsche Bank National Trust Co. and Ocwen Loan Servicing, et al.*
(Yellowstone County, Montana District Court, November 2015, Case Number DV
12-1638) ................................................................................................... 54

*Opoka v. INS,*
94 F.3d 392, 394 (7th Cir. 1996) ............................................................... 53

*Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC,*
900 F.3d 377, 383 (7th Cir. 2018) ............................................................. 39

*Rakovich v. Wade,*
850 F.2d 1180, 1192 (7th Cir. 1988) ......................................................... 17

*Reich v. Sea Sprite Boat Co.,*
50 F.3d 413, 417 (7th Cir. 1995) ............................................................... 47

*Romanucci & Blandin, LLC v. Lempesis,*
2017 U.S. Dist. LEXIS 71526, at *12 (N.D. Ill. May 4, 2017) .................... 31

*Sealy Davis v. Ocwen Federal Bank, et al.*
(04-CV-1469, Galveston County, TX, November 29, 2005) ........................ 53

*Sheehan v. Donlen Corp.,*
173 F.3d 1039, 1043 (7th Cir.1999) ........................................................... 16

*Smego v. Payne*,
854 F.3d 387, 396 (7th Cir. 2017) ............................................................ 42

*Soltys v. Costello*,
520 F.3d 737, 744 (7th Cir. 2008) ............................................................ 46

*Strauss v. Stratojac Corp.*,
810 F.2d 679, 683 (7th Cir. 1987) ............................................................ 44

*Sundquist v. Bank of Am., N.A.*,
566 B.R. 563 (Bankr. E.D. Cal. 2017) ..................................................... 54

*Taggart v. Lorenzen*,
139 S. Ct. 1795 (2019) ............................................................................... 31

*Thomas v. Cook Cty. Sheriff's Dep't*,
604 F.3d 293, 311-12 (7th Cir. 2009) ................................................ 39, 45

*Trans States Airlines v. Pratt & Whitney Can.*,
86 F.3d 725, 726 (7th Cir. 1996) ............................................................. 36

*United States ex rel. Pileco, Inc. v. Slurry Systems, Inc.*,
804 F.3d 889 (7th Cir. 2015) .................................................................... 45

*Vazquez v. Sears, Roebuck & Co. (In re Vazquez)*,
221 B.R. 222, 231 (Bankr. N.D. Ill. 1998) ............................................... 32

*Wallace v. McGlothan*,
606 F.3d 410, 418 (7th Cir. 2010) ............................................................ 16

*Walter v. Bruhn*,
40 F. App'x 244, 246 (7th Cir. 2002) ....................................................... 21

*Washington v. Lane*,
840 F.2d 443, 445-46 (7th Cir. 1988) ....................................................... 35

*Will v. Comprehensive Accounting Corp.*,
776 F.2d 665, 675 (7th Cir. 1985) .............................................. 21, 23, 27

## Rules

Rule 3002.1 of the Rules of Bankruptcy Procedure ................... 23, 28, 29, 30

# Record Citations

D.E. 174 ......................................................................................................... 6

D.E. 278, p. 46 ............................................................................................... 2

D.E. 278, p. 56 ......................................................................................... 18, 23

D.E. 278, p. 73 ............................................................................................... 2

D.E. 279, p 125 ....................................................................................... 18, 23

D.E. 279, p. 100-101 ...................................................................................... 2

D.E. 279, p. 105 ............................................................................................. 2

D.E. 279, p. 117 ............................................................................................. 2

D.E. 279, p. 123 ....................................................................................... 2, 28

D.E. 279, p. 124 ............................................................................................. 5

D.E. 279, p. 124-126 ...................................................................................... 5

D.E. 279, p. 126-128, 131 .............................................................................. 5

D.E. 279, p. 130 ..................................................................................... 3, 7, 8

D.E. 279, p. 131 ........................................................................................... 10

D.E. 279, p. 133 ............................................................................................. 3

D.E. 279, p. 134 ............................................................................................. 3

D.E. 279, p. 135 ........................................................................................... 10

D.E. 279, p. 137 ........................................................................................... 11

D.E. 279, p. 138-139 ...................................................................................... 2

D.E. 279, p. 139-140 ...................................................................................... 3

D.E. 279, p. 141-142 ...................................................................................... 3

D.E. 279, p. 142 ............................................................................................. 4

D.E. 279, p. 143 ............................................................................................. 8

D.E. 279, p. 144 ............................................................................................. 4

D.E. 279, p. 145 ............................................................................................. 4

D.E. 279, p. 146 ............................................................................................. 4

D.E. 279, p. 148 ............................................................................................. 5

D.E. 279, p. 150-151 ...................................................................................... 8

D.E. 279, p. 151 ............................................................................................. 5

D.E. 279, p. 152-153 ...................................................................................... 5

D.E. 279, p. 154-155 ...................................................................................... 4

D.E. 279, p. 157-158 ...................................................................................... 5

D.E. 279, p. 166, 169-170 .............................................................................. 6

D.E. 279, p. 171 ............................................................................................. 6

D.E. 279, p. 171-172 ...................................................................................... 6

D.E. 279, p. 173-176 ...................................................................................... 7

D.E. 279, p. 176 ............................................................................................. 6

D.E. 279, p. 178 ............................................................................................. 7

D.E. 279, p. 181 ....................................................................................... 7, 8

D.E. 279, p. 182-184 ...................................................................................... 8

D.E. 279, p. 186-187 ...................................................................................... 8

D.E. 279, p.181 .............................................................................................. 7

D.E. 280, p. 200, 203, 206, 209-210.................................................................15
D.E. 280, p. 276..........................................................................................8
D.E. 280, p. 278..........................................................................................7
D.E. 280, p. 284-293...................................................................................14
D.E. 280, p. 294.........................................................................................14
D.E. 280, p. 296...........................................................................................5
D.E. 281, p. 302-303...................................................................................14
D.E. 281, p. 304.........................................................................................14
D.E. 281, p. 305.........................................................................................14
D.E. 281, p. 306-307...................................................................................14
D.E. 281, p. 311......................................................................................9, 14
D.E. 281, p. 312.........................................................................................15
D.E. 281, p. 315-318..................................................................................8, 9
D.E. 281, p. 319-320...................................................................................10
D.E. 281, p. 321-322.....................................................................................6
D.E. 281, p. 344...........................................................................................9
D.E. 281, p. 346...........................................................................................9
D.E. 281, p. 347-350...................................................................................10
D.E. 281, p. 351.........................................................................................12
D.E. 281, p. 352.........................................................................................12
D.E. 281, p. 353.........................................................................................12
D.E. 281, p. 358.........................................................................................12
D.E. 281, p. 370.........................................................................................11
D.E. 281, p. 371.........................................................................................11
D.E. 281, p. 373-374...................................................................................11
D.E. 283, p. 508, 514-15..............................................................................16
D.E. 283, p. 538-539...................................................................................10
D.E. 283, p. 548-549...................................................................................13
D.E. 283, p. 551-552...................................................................................11
D.E. 283, p. 561...........................................................................................9
D.E. 283, p. 562...........................................................................................9
D.E. 283, p. 574-575.....................................................................................9
D.E. 284, p. 648.........................................................................................12
D.E. 284, p. 649-650...................................................................................13
D.E. 284, p. 654-658...................................................................................13
D.E. 284, p. 657.........................................................................................13
D.E. 284, p. 657, line 20 – p. 658, line 8 ........................................................5
D.E. 284, p. 659.........................................................................................13
D.E. 285, p. 730-731, 741-42.......................................................................16
D.E. 285, p. 780.........................................................................................16
D.E. 285, p. 780-781...................................................................................36
D.E. 285, p. 806-807...................................................................................15
D.E. 285, p. 819.........................................................................................15
D.E. 285, p.762............................................................................................4

D.E. 325, p. 889-90............................................................................16
D.E. 327, p. 1012-1019......................................................................40
D.E. 327, p. 1013..............................................................................40
D.E. 327, p. 1014-1015......................................................................40
D.E. 327, p. 1016, line 23..................................................................40
D.E. 327, p. 1017..............................................................................40
D.E. 327, p. 1019..............................................................................41
D.E. 327, p. 1057-1059......................................................................41
D.E. 327, p.1015, line 17...................................................................40
D.E. 327, p.1016, lines 1-3................................................................40
D.E. 327, p.1019...............................................................................41
D.E. 328, p. 1151..............................................................................26
D.E. 328, p. 1157..............................................................................52
D.E. 328, p. 1165..............................................................................23
D.E. 328, p. 1165-1166......................................................................22
D.E. 328, p. 1167..............................................................................47
D.E. 347..........................................................................................16
D.E. 353.....................................................................................15, 34
D.E. 354.....................................................................................15, 34
D.E. 355............................................................................................2
D.E. 356.......................................................................................2, 28
D.E. 357............................................................................................2
D.E. 358........................................................................................4, 5
D.E. 359..........................................................................13, 18, 23, 25
D.E. 360..........................................................................................14
D.E. 361..........................................................................................14
D.E. 362..........................................................................................12
D.E. 363....................................................................................passim
D.E. 364....................................................................................passim

## APPELLEE'S JURISDICTIONAL STATEMENT

The Appellee agrees that Appellants' Jurisdictional Statement is complete and correct.

## STATEMENT OF THE ISSUES

At every opportunity in this case Ocwen intentionally chose lawlessness over the rule of law. Ocwen repeatedly and intentionally ignored the bankruptcy discharge injunction to hound Ms. Saccameno for the payment of monies Ocwen was not owed and had no right to collect. Marla's Mistake, as Ocwen describes it, was actually a deliberate decision to code Ms. Saccameno's loan as dismissed so that all of Ocwen's collections processes could move forward with full force after the bankruptcy discharge was entered.

Ms. Saccameno's statement of the case, pulled from the record evidence, thoroughly details Ocwen's intentional acts. Every act of Ocwen, including the alleged accidental miscoding, was intentionally and willfully in violation and defiance of the bankruptcy discharge injunction.

Ocwen had to engage in contrivance and gamesmanship to craft an argument about the punitive damages award in this case that has facial plausibility. In truth, there is no plausibility to Ocwen's argument. To claim that there is a 37:1 ratio Ocwen had to ignore the economic costs of this litigation. Inclusion of the economic costs of the litigation yields a ratio of 3.6:1.

## STATEMENT OF THE CASE FROM THE RECORD EVIDENCE

1) Ocwen claimed it was not at fault because Saccameno's loan was miscoded by an employee. Ocwen called this "Marla's Mistake" throughout trial beginning with opening statements. (D.E. 278, p. 46).

2) Gina Feezer testified she was not testifying individually but as Ocwen's corporate representative. (D.E. 279, p. 117).

3) Ocwen agreed that in servicing a mortgage loan account Ocwen could not cause needless consumer harm or needlessly threaten a consumer's home ownership. Ocwen also agreed that it did not specifically target Ms. Saccameno. (D.E. 278, p. 73).

4) Ocwen admits it was served with the filings from the bankruptcy court after filing its notice of transfer of claim in September of 2011. (D.E. 279, p. 100-101; D.E. 355).

5) The Bankruptcy Court for the Northern District of Illinois entered a discharge order in Ms. Saccameno's bankruptcy case on June 27, 2013. (D.E. 279, p. 105; D.E. 357).

6) On July 2, 2013, Ocwen received the bankruptcy court's Rule 3002.1 notice, the "Notice of Final Cure Payment." (D.E. 279, p. 123; D.E. 356).

7) Just a few hours later, Ocwen coded Ms. Saccameno's account as dismissed from bankruptcy instead of discharged in bankruptcy. Ocwen claims that act was done in reliance on the "Notice of Final Cure Payment." This coding is what Ocwen called "Marla's Mistake" throughout trial. (D.E. 279, p. 138-139).

8) Ocwen agrees that the Notice of Final Cure Payment is one of the most material filings in a Chapter 13 case. (D.E. 279, p. 130).

9) Ocwen agrees it would be hard for anyone working in bankruptcy with even rudimentary knowledge of bankruptcy to confuse a notice of final cure payment with any order, much less an order of dismissal. (D.E. 279, p. 139-140).

10) Ocwen also agrees that no document in any court case or in Ocwen's files indicates Ms. Saccameno's bankruptcy was dismissed. (D.E. 279, p. 134).

11) Ocwen agreed that coding Ms. Saccameno's loan as dismissed on July 2, 2013 conflicted with Ocwen's own business records which already showed Ms. Saccameno had received a bankruptcy discharge. (D.E. 279, p. 133).

12) Because of the coding as dismissed, Ms. Saccameno received her first statement post-bankruptcy discharge (July 2013) that contained an amount due of $15,837.19. The June 2013 statement showed Ms. Saccameno was not due for a payment until September 2013 and Ocwen owed her $1,100. In July, Ocwen demanded, after deductions of amounts held in suspense, an immediate payment under threat of foreclosure in the amount of $10,089.66. Ocwen admits this was a serious mistake. (D.E. 279, p. 141-142).

13) Also, because Ocwen coded Ms. Saccameno's loan account as dismissed, the account was not put through a post-bankruptcy audit or reconciliation. According to Ocwen, this would have removed any amounts accrued but unpaid post-petition and brought the loan current as of the first month post-discharge. If the loan had gone through reconciliation, Ms. Saccameno's July 2013

statement would have shown her due for about $1,600 instead of $10,089.66. (D.E. 279, p. 142).

14) Ocwen also admits coding the loan as dismissed resulted in Ocwen pursuing collections against Ms. Saccameno. (D.E. 174, ¶¶ 22, 24, 26, 27) (D.E. 279, p. 146).

15) Ocwen's first collection letters to Ms. Saccameno arrived about ten days after her bankruptcy discharge was entered by the Bankruptcy Court. (D.E. 279, p. 146).

16) Ocwen classified these letters as "help" letters. Ocwen's "help" letters, beginning with D.E. 358, stated that Ms. Saccameno's mortgage loan was severely delinquent, costs and fees would accumulate and threatened foreclosure and eviction. Ocwen testified this letter was "helpful" to Ms. Saccameno and was a customer service letter. (D.E. 279, p. 144).

17) Ocwen admitted that the letter it described as a "help" letter is classified as a collections letter in Ocwen's business records. (D.E. 279, p. 154-155).

18) Ocwen's "help" letter ended with the statements "Time is running out. We may have resolutions available to help you avoid losing your home and having to make plans to vacate the property. Remember, poor credit may affect your ability to secure another place to live, even as a tenant of a rental property." (D.E. 279, p. 145).

19) Ms. Saccameno called this shocking letter the "you'll never rent in this town again" letter. (D.E. 285, p.762).

20) Ocwen sent another letter containing the exact same language as D.E. 358 three days later on July 9, 2013. Ocwen could not explain why this same letter was sent to Ms. Saccameno three days apart. (D.E. 279, p. 148).

21) Ocwen also assessed a property valuation (BPO) fee to Ms. Saccameno's mortgage account on July 5, 2013 (D.E. 279, p. 151). The only reason the fee was added was because Ocwen coded the loan as dismissed instead of discharged. (D.E. 279, p. 152-153).

22) Ocwen also began assessing fees to Ms. Saccameno's loan for property inspections because of this coding of Ms. Saccameno's loan. (D.E. 279, p. 157-158).

23) Also because of this coding as dismissed, Ocwen did not respond to the Notice of Final Cure Payment as required by Rule 3002.1. (D.E. 279, p. 124).

24) Had Ocwen complied with bankruptcy rule 3002.1 the payment dispute that became the subject of this lawsuit could have been resolved by the Bankruptcy Court in 2013 when there was about $3,200 in dispute (D.E. 279, p. 124-126).

25) Ocwen also agrees that *if* Ms. Saccameno actually had a post-petition default the Bankruptcy Court could have extended her Chapter 13 bankruptcy plan to allow her to pay any post-petition default in June of 2013. (D.E. 279, p. 126-128, 131). The evidence is undisputed Ms. Saccameno paid all amounts due under her bankruptcy plan both for the proof of claim and the post-petition payments, overpaying by $1,187. (D.E. 280, p. 296; D.E. 284, p. 657, line 20 – p. 658, line 8).

26) Even if Rule 3002.1 were not in place to remedy this situation *before the discharge was entered*, the discharge injunction unquestionably should have prevented Ocwen's conduct here. (D.E. 281, p. 321-322).

27) Ocwen's willful violation of the bankruptcy discharge order put Ms. Saccameno through a living hell for a period of 1,735 days. Of that time period, "Marla's Mistake" could only be blamed for 20 of the first 30 days of this dispute ranging from July 2, 2013 to July 23, 2013. Ocwen concedes that by July 23, 2013, any Ocwen employee looking at Ms. Saccameno's loan account could see that her loan had been discharged in bankruptcy. (D.E. 174, ¶¶28-29)(D.E. 279, p. 166, 169-170). Ocwen has no explanation for its conduct for the remaining 1,715 days of illegality.

28) Ocwen testified it raised the bankruptcy discharge flag on Ms. Saccameno's account to indicate to any employee reviewing the file that the Chapter 13 bankruptcy had discharged on July 25, 2013. Ocwen claimed this corrected "Marla's Mistake" of coding Ms. Saccameno's loan as dismissed. (D.E. 279, p. 171). Ocwen could have stopped the problem with Ms. Saccameno's mortgage loan account at this time. (D.E. 279, p. 171-172).

29) Ocwen testified that after it received the bankruptcy discharge on July 23, 2013, that the loan did finally go through bankruptcy reconciliation on July 25, 2013. (D.E. 279, p. 176).

30) Still on July 25, 2013, Ocwen took numerous steps intended to correct the errors from coding Ms. Saccameno's loan account as dismissed. (D.E. 279, p. 173-176).

31) Everything between July 25 and August 1, 2013 indicated that Ocwen was correcting the loan account through the reconciliation process. (D.E. 279, p. 178).

32) Ocwen also testified foreclosure was moving forward while Ocwen was trying to correct the accounting issues related to coding the loan account as dismissed. (D.E. 280, p. 278).

33) The reconciliation work continued until August 8, 2013 when Ocwen's business records show an entry which states:

> "The BK DC flag cannot be raised on this loan as it is a Chapter 13 discharge. The debtor made 40 payments which paid from 1/1 of 2010 through 4/1/2013, leaving the debtor due for 5/1 of '13. The POC was filed in the amount of $22,552.08 and that the same was paid in full by the trustee." (D.E. 279, p. 181).

34) Ocwen had earlier admitted that even if Ms. Saccameno had missed two post-petition payments before the discharge, those two payments would have been uncollectable due to the bankruptcy discharge. (D.E. 279, p. 130).

35) Ocwen testified that the entry at D.E. 279, p.181 should be read as indicating the bankruptcy discharge flag was already up so it could not be raised again. Ocwen conceded, however, that if the bankruptcy discharge flag was raised

there would not have been collections activity after this entry. (D.E. 279, p. 182-184).

36) However, Ocwen's August 2013 statement to Ms. Saccameno showed a past due balance exceeding $5,000 and sought to collect the two payments Ocwen believed were missing from the post-petition, pre-discharge payments discussed in the entry at D.E. 279, p. 181. In August 2013, Ocwen even applied a current post-discharge mortgage payment from Ms. Saccameno to one of the two pre-discharge payments Ocwen admitted was discharged in bankruptcy. (D.E. 279, p. 186-187). Ocwen agreed it could not collect those two payments and claimed it had written them off. (D.E. 279, p. 130 and D.E. 280, p. 276).

37) Ocwen initially testified the bankruptcy flag was raised in July of 2013. (D.E. 279, p. 182-184). Ms. Saccameno proved this was false, in front of the jury, by comparing this testimony about to where Ocwen actually raised the bankruptcy flag on 2/2/15 in response to this lawsuit. (D.E. 281, p. 315-318). Comparing these entries forced Ocwen to admit the bankruptcy flag was not raised in July of 2013 as it had previously testified.

38) The coding of Ms. Saccameno's loan as dismissed also triggered the foreclosure process to go from "foreclosure hold" to "active foreclosure." (D.E. 279, p. 143).

39) Ocwen's records show that work on the foreclosure of Ms. Saccameno's home resumed on July 3, 2013 (D.E. 279, p. 150-151), immediately following the dismissal coding.

40) Ocwen testified that after the bankruptcy discharge was entered the foreclosure complaint should have been dismissed. (D.E. 283, p. 561).

41) Instead of dismissing the foreclosure, Ocwen persisted. Ocwen executed an affidavit in furtherance of its foreclosure action on June 30, 2014 which falsely sought $857 in default related fees and costs incurred. (D.E. 281, p. 344).

42) Ocwen also executed a loss mitigation affidavit on January 2, 2015 in furtherance of its ongoing foreclosure action. (D.E. 281, p. 346).

43) The foreclosure complaint sought an order of eviction and a personal deficiency judgment "against parties who have not received a Chapter 7 discharge" which included Ms. Saccameno, whose discharge was under Chapter 13. (D.E. 283, p. 562).

44) Ocwen admitted the foreclosure module would not have remained open and the foreclosure case would not have continued if the bankruptcy discharge had been processed correctly. (D.E. 283, p. 574-575).

45) Ocwen also admitted if the bankruptcy discharge flag is up, the foreclosure module is placed on hold and cannot proceed. (D.E. 281, p. 315-318).

46) However, foreclosure did proceed after July 23, 2013 all the way through February 2, 2015 when the bankruptcy discharge flag was finally raised, though Ocwen still failed to dismiss the foreclosure until March 14, 2016, more than a year after Ms. Saccameno had filed this lawsuit. (D.E. 281, p. 311).

47) Ocwen admitted everything that occurred between July 23, 2013 and February 2, 2015 would not have occurred if Ocwen had raised the bankruptcy discharge flag appropriately on July 23, 2013. (D.E. 281, p. 319-320).

48) Ocwen also admitted that all communications with Ms. Saccameno between the discharge date of June 27, 2013 and August 2013 were false because of the first miscoding of the loan on July 2, 2013. Ocwen also testified that the seventeen statements sent to Ms. Saccameno beginning in September of 2013 would have contained false information based upon Ocwen's continued coding of the bankruptcy as dismissed. (D.E. 281, p. 347-350).

49) Also, all the communications between September of 2013 and February of 2015 contained falsehoods and were inaccurate for the same reason. (D.E. 283, p. 538-539).

50) Ocwen did not examine whether anyone else's bankruptcy loan account was coded in June or July of 2013 as dismissed instead of discharged. (D.E. 279, p. 131).

51) Ocwen undertook no investigation to determine if Marla coded every bankruptcy file she touched wrong, Ocwen did not know how long Marla had been employed when the dismissal coding took place, Ocwen did not know if Marla was employed at the time of Ocwen's deposition but believed she was not employed by Ocwen at the time of trial. (D.E. 279, p. 135).

52) After four years and nine months Ocwen could not say whether Ms. Saccameno was the only person whose loan was wrongly coded as dismissed or

the millionth person it happened to because Ocwen made no investigation into the issue. (D.E. 279, p. 137).

53) Ocwen admits that it did nothing to investigate the scope and severity of the problem or to make sure no other borrowers were affected despite having knowledge since 2011 that Ocwen had deficiencies in its [servicing] platform that require Ocwen to use manual processes. (D.E. 283, p. 551-552).

54) Ocwen gained this knowledge from regulatory actions by the New York Department of Financial Services (NYDFS). (D.E. 364). A regulatory examination by the NYDFS found that Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. As a result, Ocwen regularly gives borrowers incorrect or outdated information… and maintains inaccurate records. There are insufficient controls in place, either manual or automated, to catch all these errors and resolve them. (D.E. 281, p. 370). Ocwen's core servicing functions rely on its inadequate systems and personnel. (D.E. 281, p. 371). Finally, the regulator found that prior to its review, Ocwen did not take adequate steps to implement reforms that it was legally obligated to implement prior to the 2011 agreement. After reviewing D.E. 364 Ocwen was forced to concede that at least since 2011 Ocwen was aware of regulatory concerns expressed about problems with RealServicing. (D.E. 281, p. 373-374).

55) Also, in D.E. 363, Ocwen had agreed with the United States through the CFPB and 49 States that going forward all loans exiting bankruptcy, even

dismissals, would be put through a bankruptcy audit or reconciliation. The reconciliation did not occur here for almost two months and still incorrectly claimed Ms. Saccameno owed additional monies. ¶¶ 28-34, infra.

56) The jury was also shown D.E. 362. This is a payment reconciliation history of Ms. Saccameno's loan account through September 27, 2016. This covered the entire history of Ocwen's servicing of Ms. Saccameno's loan through the date of the document. (D.E. 281, p. 351). This document has a column on the far left titled "last change date." This column revealed that Ocwen was making changes to the payment history of Ms. Saccameno's mortgage loan account approximately 18 months into the litigation. (D.E. 281, p. 352).

57) For instance, Ocwen changed the beginning balance of the late charges and fees on the loan account on September 27, 2016, over five years after the July 2011 date Ocwen initially "onboarded" Ms. Saccameno's account into *RealServicing*. (D.E. 281, p. 353). This led to a lengthy discussion of Ocwen's multiple changes to Ms. Saccameno's account records years after the fact. Ocwen admits there is no information in D.E. 362 that would tell the reader what was changed or why it was changed. This includes multiple changes to the account records during the litigation. (D.E. 281, p. 358).

58) Ms. Saccameno's forensic accountant, Bernard "Jay" Patterson, found that Ocwen had made an accounting error in its favor onboarding Ms. Saccameno's loan into *RealServicing* in the amount of $4,208. Ocwen maintained Ms. Saccameno owed this additional amount. (D.E. 284, p. 648).

59) Ocwen also applied a post-petition regular mortgage payment to amounts other than principal, interest and escrow. (D.E. 284, p. 649-650). Patterson also identified $921.43 of trustee funds not applied correctly to Ms. Saccameno's mortgage loan account and seven post-petition payments not applied correctly.

60) These mistakes included underapplying $7,388.45 to principal and interest and $2,180.80 to escrow and overapplying $1,266.60 in post-petition funds to late charges, $1,055.63 to corporate advances, $7,551.32 to suspense, and returning $1,800 to the borrower. (D.E. 284, p. 654-658).

61) Between the errors and changes in Ocwen's records, the net result is that Ocwen incorrectly applied $12,804.27 in post-petition payments to amounts other than principal, interest and escrow. (D.E. 284, p. 659) $2,322.23 of this money was paid to Ocwen improperly (late charges and corporate advance amounts). (D.E. 284, p. 657).

62) Ocwen acknowledged it had to apply payments according to the mortgage contract. Ocwen also conceded that it could not foreclose on a consumer not in default. (D.E. 283, p. 548-549).

63) One of Ocwen's key justifications for its never-ending abuse of Ms. Saccameno was the claim that Ms. Saccameno only made 40 of her 42 post-petition bankruptcy payments prior to her discharge in bankruptcy. (D.E. 359). Throughout the first day of trial Ocwen contended these two missed payments contributed to the problems caused by "Marla's Mistake" and justified Ocwen's actions towards Saccameno. On the second day of trial, Ocwen was forced to

admit Ms. Saccameno had made all 42 post-petition payments on the mortgage loan account. This was done by Ms. Saccameno's counsel walking Ocwen through its own payment records to count out the 42 post-petition payments. (D.E. 280, p. 284-293).

64)  Ocwen's actual accounting records are D.E. 360 and D.E. 361.

65)  Ocwen was also forced to admit these records were in its possession and readily available at all times. (D.E. 280, p. 294).

66)  Ocwen was also forced to admit that Ms. Saccameno made all post-discharge payments due between July and September of 2013. (D.E. 281, p. 302-303).

67)  Ocwen also conceded that all information needed to determine Ms. Saccameno had paid all amounts due and owing was in Ocwen's records in July and August of 2013 when Ocwen was researching Ms. Saccameno's account. (D.E. 281, p. 304).

68)  Ocwen also conceded that an accurate review of its records in August of 2013 would have stopped everything that happened to Ms. Saccameno over the ensuing four years and nine months. (D.E. 281, p. 305).

69)  Ms. Saccameno also made her September 2013 payment timely. However, that payment was returned because Ocwen's records had not been corrected and still showed the account four to five months delinquent. (D.E. 281, p. 306-307).

70)  After September of 2013, Ocwen rejected 17 straight payments from Ms. Saccameno. (D.E. 281, p. 311).

71) Ocwen agrees Ms. Saccameno's mortgage loan account should have been current in September of 2013 had Ocwen properly processed the bankruptcy discharge. (D.E. 281, p. 312).

72) Ocwen also made unsolicited offers of loan modifications to Ms. Saccameno at D.E. 353 and D.E. 354.

73) The modification in D.E. 353 capitalizes approximately $20,000 in various amounts including amounts that Ocwen was seeking to collect in violation of the bankruptcy discharge.

74) The modification in D.E. 354 sought to capitalize similar amounts and to extend the term out a fresh 30 years and included a balloon payment due in full at the end of that 30 year term in the amount of $58,000. Ms. Saccameno characterized this offer as a double life sentence. (D.E. 285, p. 806-807).

75) Testimony from Ms. Saccameno's primary care physician proved Ms. Saccameno suffered from depression, anxiety and panic disorders requiring medication for a period of years after Ocwen's conduct began. Ms. Saccameno's physician described her depression as "melancholy," like the depression one would experience after the death of a loved one. (D.E. 280, p. 200, 203, 206, 209-210).

76) Ocwen denied Ms. Saccameno a normal life for four years and nine months. (D.E. 285, p. 819).

77)   Ms. Saccameno's trauma was corroborated by multiple witnesses who testified to the impact of Ocwen's conduct on Ms. Saccameno without objection. (D.E. 283, p. 508, 514-15; D.E. 285, p. 730-731, 741-42; D.E. 325, p. 889-90).

78)   Ms. Saccameno testified without contravention she was financially vulnerable. (D.E. 285, p. 780).

79)   After all post-trial motions were briefed and under submission, Ms. Saccameno and Ocwen agreed that her reasonable interim attorney's fees and costs through April 30, 2018 were $750,000. This amount was entered by the Court at D.E. 347 on February 5, 2019.

## <u>STATEMENT OF THE STANDARD OF REVIEW</u>

"Attacking a jury verdict is a hard row to hoe." *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1043 (7th Cir.1999). The court should consider the totality of the evidence and view the evidence in a light most favorable to the non-moving party and in a light that supports the verdict. *Wallace v. McGlothan,* 606 F.3d 410, 418 (7th Cir. 2010). ***The court "shall not second-guess the jury's view of the contested evidence; the proper inquiry is whether, given the totality of the evidence, [plaintiff] presented sufficient evidence from which a reasonable jury could find in [her] favor." *David v. Caterpillar, Inc.,* 324 F.3d 851, 858 (7th Cir.2003). With respect to the jury instructions, evidentiary rulings, and disposition of attorneys' fees, the Court reviews the district court's actions for abuse of discretion so long as the law was fairly stated to the jury. See *Molnar v. Booth*, 229 F.3d 593, 597 (7th Cir. 2000).

As to jury instructions, "[i]nstructions not objected to become the "law of the case," a limited doctrine that can affect our decision regarding a motion for judgment notwithstanding the verdict. Here if the instructions given in the district court state the law of the case for purposes of the judgment notwithstanding the verdict determination, we cannot apply law at odds with those instructions." See *Rakovich v. Wade*, 850 F.2d 1180, 1192 (7th Cir. 1988)(citation omitted).

"We review a district court's due process analysis of punitive damages de novo. Punitive damages are analyzed under the framework established in *BMW of North America, Inc. v. Gore* [...] Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. Punitive damages violate the Due Process Clause only when an award can fairly be categorized as 'grossly excessive' in relation to these interests. It is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary. The judicial function is to police a range, not a point." See *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) (Internal citations and quotes omitted).

## SUMMARY OF THE ARGUMENT

Ocwen claims that its conduct was merely negligent and not worthy of a punitive sanction. The jury was free to disregard Ocwen's contention that this was a mistake. The record evidence shows Ocwen's business records listed Ms. Saccameno's loan as discharged in bankruptcy when "Marla" coded Ms. Saccameno's loan account as dismissed. Coding Ms. Saccameno's loan as dismissed

was required by Ocwen's system to allow Ocwen's collection and foreclosure efforts to resume. Ocwen ignored the bankruptcy discharge all the way through to the second day of trial claiming Ms. Saccameno had only made 40 of 42 post-petition direct mortgage payments under her bankruptcy plan.

Even if the coding of Ms. Saccameno's loan account as dismissed was, in fact, "Marla's Mistake," Ocwen fails to inform the Court that this "mistake" was allegedly remedied within 20 days of its occurrence and within the first 30 days of this controversy. The fact is that Ocwen maintained the position that it had the right to collect against Ms. Saccameno because she had only made 40 of 42 payments under her bankruptcy plan. (D.E. 359). Ocwen maintained this position all the way to the second day of this trial. (D.E. 278, p. 56; D.E. 279, p 125). This is a period of four years and nine months, or 1,735 days. Ocwen's ongoing conduct continued for 1,715 days ***after*** Ocwen testified "Marla's Mistake" was fixed. Ocwen does not defend this 1,715 days of ongoing lawlessness. The jury rejected Ocwen's position and punished Ocwen with the imposition of punitive damages.

Ocwen next argues that there was insufficient evidence to show "deliberate corporate participation through its officers and directors" to sustain a punitive damages award. This argument is waived.

Even if the Court considered this argument there is ample evidence supporting the jury's decision. The highest levels of Ocwen's management had many years' notice of the very types of problems that resulted in drastic and life altering harm to Ms. Saccameno and did nothing to correct the problems.

Ocwen next argues, without authority, the Supreme Court announced a presumption of a 1:1 ratio of punitive to compensatory damages in "cases such as this." Ocwen ignores this Court's precedent and urges adoption of a presumption this Court has already rejected.

Ocwen also argues that "even if" punitive damages were appropriate the amount awarded was excessive. Ocwen arrives at a 37:1 ratio by ignoring a portion of the compensatory damages awarded in the verdict. This Court can "assume without deciding" that Ocwen's argument regarding the aggregation of damages is correct and still resolve the question without addressing Ocwen's constitutional argument. This is because Ocwen neglected to consider the economic costs of the litigation in its denominator. After considering the agreed economic costs of the litigation the ratio is 3.6:1. Ocwen's argument on this point lacks merit.

Most interestingly, Ocwen argues that this Court has the constitutional authority to "order the district court to enter a new judgment at the constitutional limit" without offering Ms. Saccameno the choice of a new trial. Ocwen makes this argument while ignoring this Court's directly contrary holdings in *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir. 1984), followed by *Adams v. City of Chi.*, 798 F.3d 539 (7th Cir. 2015) and most recently in *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951 (7th Cir. 2018).

Ocwen also urges that the district court improperly aggregated Ms. Saccameno's compensatory damages to find a ratio of 5:1. This Court does not have to determine whether it was constitutional to aggregate these damages because

Ocwen neglected to include the economic costs of litigation in its denominator. It is only necessary for the Court to consider Ocwen's constitutional arguments if the Court disagrees with Ms. Saccameno on this basic question of law.

If the Court does disagree with Ms. Saccameno, then this Court should consider Ms. Saccameno's arguments that Ocwen contrived these constitutional questions. Ms. Saccameno argues that the Court can bind Ocwen to its trial counsel's agreement that the compensatory damages lines on the verdict form would be aggregated.

Without the parties' agreement to treat the verdict form in this manner, the verdict form would be illegal because it improperly apportions compensatory damages among theories of relief. Alternatively, this Court can apply an estoppel against Ocwen denying Ocwen the right to argue that the only compensatory damages that should be considered are $82,000. This would be appropriate because Ocwen took a position at trial inconsistent with its present position in order to secure Ms. Saccameno's agreement to use Ocwen's otherwise illegal verdict form.

If the Court does not bind Ocwen to its agreement at trial or apply an estoppel against Ocwen's argument on this point the Court should allow Ms. Saccameno's argument that the verdict form is illegal in the absence of the parties' agreement and remand the case for a new trial on damages, again without having to address Ocwen's contrived and unnecessary constitutional questions.

Lastly, the Court could bind Ocwen to its trial agreement on the verdict form *and* consider the $582,000 as the total compensatory damages as well as the

attorney's fees awarded of $750,000 for a denominator of $1,332,000 and a ratio of 2.25:1. Most importantly, none of the *proper* ratios actually in play for this Court's analysis even approach a level of constitutional anxiety.

## ARGUMENT

### I.     Any Reasonable Jury Would Award Punitive Damages on Ms. Saccameno's ICFA Claim

Ocwen concedes both liability under the ICFA (and all other legal theories) and the propriety of the entire compensatory damages award. See Opening Brief, p. 1 and p. 5. Ocwen is bound by its counsel's concession. *Link v. Wabash R.R. Co.*, 82 S. Ct. 1386, (1962). Therefore, the only issue to decide on this point is whether no reasonable juror could have found the evidence sufficient under the instructions it heard to award punitive damages against Ocwen. See *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 675 (7th Cir. 1985). This analysis is undertaken with the presumption the jury followed the instructions given and applied them to the facts as the jury found them. *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 569 (7th Cir. 2003).

At the outset, Ocwen stated the wrong standard for the assessment of whether the evidence supports the damages awarded. Illinois law does not control the analysis. This Court has adopted the federal reasonable person standard across the board. *Walter v. Bruhn*, 40 F. App'x 244, 246 (7th Cir. 2002)(Internal citations and quotations omitted).

The agreed jury instructions are the standard for the jury's imposition of punitive damages, not the cases cited by Ocwen in brief. The instructions on

punitive damages are found in the transcript at D.E. 328, p. 1165-1166. Ocwen's attempt to interject "deliberate corporate participation by and through its officers and directors" is inapplicable here. The argument is waived because the law of the case is controlled by the jury's instructions, not Ocwen's reference to Illinois law. See *Hunt v. Chi. Hous. Auth.*, 1992 U.S. App. LEXIS 20161, at *36 (7th Cir. Aug. 19, 1992).

Ocwen's other arguments on this point are equally unavailing for the same reasons. Ocwen does not challenge the jury's findings under the applicable federal standard or under the law of the case but rather on new, previously unargued grounds under Illinois law. This argument is waived and Ocwen's challenge to the jury's verdict on this point must be rejected. See *Frey Corp. v. City of Peoria,* 735 F.3d 505, 509 (7th Cir. 2013). If this Court disagrees with Ms. Saccameno that Ocwen has failed to argue this issue under the appropriate standard or to show an absence of evidence to support the punitive damages award, Ms. Saccameno will outline the evidence supporting the award.

### A. Ocwen's Conduct Satisfies the Standard for the Imposition of Punitive Damages

The evidence clearly shows that Ocwen made a deliberate choice to code Ms. Saccameno's loan as dismissed instead of discharged for the purpose of pursuing collections against Ms. Saccameno. Paragraphs 7 and 11 supra[1] demonstrate Ocwen coded the loan as dismissed when it was already listed as discharged in Ocwen's system of record. Ocwen had no explanation for how that could even happen. Ocwen

---

[1] All paragraph references in the brief refer to Saccameno's "Statement of the Case from Record Evidence" supra.

also testified no employee with rudimentary knowledge of bankruptcy could confuse a notice of final cure payment with any court order, much less a discharge order. ¶9. Ocwen agreed nothing in its records or the court records showed Ms. Saccameno's loan was dismissed. ¶10. This evidence would allow a jury to infer a deliberate choice was made to code Ms. Saccameno's loan as dismissed instead of discharged.

Ocwen maintained all the way into the second day of trial that Ms. Saccameno made 40 of 42 payments during her bankruptcy plan and prior to her discharge. (D.E. 278, p. 56; D.E. 279, p 125; D.E. 359). Ocwen coding Ms. Saccameno's loan as dismissed instead of discharged restarted its collections and foreclosure processes. ¶¶14, 38. The dismissal coding also prevented Ocwen from responding to the Rule 3002.1 notice or putting Ms. Saccameno's loan account through a bankruptcy audit. ¶¶13, 23. None of this could have happened had Ocwen properly handled the bankruptcy discharge. ¶¶47-49. A reasonable jury could find an abundance of evidence for the proposition that every act of Ocwen after June 27, 2013 that makes up the factual core of this case was taken in knowing and intentional violation of the bankruptcy discharge order.

To prevail on a sufficiency of the evidence argument, Ocwen must show that no reasonable jury could find by a preponderance of the evidence that Ocwen's conduct was committed with fraud, actual malice, deliberate violence or oppression, or Ocwen acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others, and proximately caused injury and/or damage to Ms. Saccameno. See *Will v. Comprehensive Accounting, infra* and D.E. 328, p. 1165.

Ocwen does not even attempt to make such a showing. Rather, Ocwen argues, without citation to the record, that its actions were merely accidental or negligent.

At trial, the jury was faced with two competing narratives. Ms. Saccameno's position was Ocwen was guilty of deliberate and intentional outrageous conduct in furtherance of illegal collections. Ocwen's position was "Marla's Mistake." Ocwen's narrative does not hold up to factual scrutiny and a jury was free to reject Ocwen's version of events. The most compelling reason to reject this narrative comes from Ocwen's own admissions in the record evidence. Ocwen should have corrected "Marla's Mistake" no later than July 23, 2013, 20 days after the error. ¶¶27-28, supra. Ocwen's illegal conduct continued for an additional 1,715 days beyond July 23, 2013.

### i. Nothing Ocwen Did after July 23, 2013 Could Be Blamed on "Marla's Mistake"

"Marla's Mistake" occurred on July 2, 2013. ¶¶6-7. Ocwen concedes its own business records provided every Ocwen employee with knowledge of Ms. Saccameno's bankruptcy discharge by July 23, 2013. ¶¶27-28. Ocwen also testified that its activities on July 23, 2013 corrected "Marla's Mistake." *Id.* Ocwen has no explanation for its conduct for the remaining 1,715 days.

A reasonable jury was free to disregard Ocwen's explanation of "Marla's Mistake" as scapegoating for several reasons. "Marla's Mistake" covered a period of twenty days, Ocwen and all of its employees indisputably had knowledge of the bankruptcy discharge order by July 23, 2013, and Ocwen made a deliberate corporate choice to continue to pursue illegal collections instead of raising the

bankruptcy discharge flag. ¶¶29-34. Even if a jury could grant a pass for the period prior to July 23, 2013, Ocwen offers no excuse for its conduct beyond that date. A reasonable jury could readily infer everything that happened to Ms. Saccameno from day one, but indisputably beyond July 23, 2013, fell squarely on Ocwen, its defective systems and its ineffective personnel.

### ii. The Record is Rife with Ocwen's Knowledge of Wrongdoing and Intentional Actions in Defiance of the Bankruptcy Discharge Order

Ocwen's admitted and proven conduct evinces full knowledge of the bankruptcy discharge order and willful, intentional choices to ignore that Court Order. See ¶¶4-5, 11, 12-53. This evidence demonstrates multiple points in time where Ocwen purposefully chose to continue pursuing debt collections in knowing contravention of the bankruptcy discharge order. This includes specifically ¶33 where an Ocwen employee intentionally refused to raise the bankruptcy discharge flag (and thereby stop collections) because of Ocwen's position that only 40 of 42 payments had been made. See, also, D.E. 359.

### iii. Ocwen Indisputably Had Longstanding Corporate Knowledge of the Types of Problems that Caused Ms. Saccameno Harm

On appeal, Ocwen has abandoned any objection to D.E. 363 and D.E. 364. These exhibits are portions of two regulatory settlements involving Ocwen. D.E. 363 was between Ocwen and the US through the CFPB and 49 States. D.E. 364 was between Ocwen and the New York Department of Financial Services (NYDFS). A reasonable jury is free to make reasonable inferences and this jury was so charged

(D.E. 328, p. 1151). This jury was also charged that the district court had taken judicial notice of these two regulatory settlements that were signed in December of 2013 and December of 2014 in which Ocwen compromised disputed claims. The district court admitted into evidence portions of those documents to indicate that certain issues were brought to Ocwen's attention (D.E. 328, p. 1151). This evidence is set out in ¶¶53-55, supra. Ocwen's conduct in defiance of its legal obligations set out in the two consent decrees dovetails with Ocwen's open defiance of the bankruptcy discharge order for a period of years.

A reasonable jury could infer that Ocwen was intentionally acting in violation of law with full knowledge that its conduct would cause needless harm to consumers like Ms. Saccameno. Ocwen's conduct could clearly be classified as reckless indifference to the harm Ocwen was inflicting upon its customers given the knowledge of problems contained in D.E. 363 and D.E. 364. A reasonable jury could certainly find that Ocwen was well aware that *RealServicing's* unresolved systemic issues deliberately and intentionally inflicted harm upon Ms. Saccameno and other Ocwen customers. "Legal malice may be shown by reckless indifference for an act's consequences." See *Boyd v. Tornier, Inc.*, 656 F.3d 487, 497 (7th Cir. 2011). "'[W]illful and wanton misconduct approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.' Similarly, [another case] defines 'willful and wanton' as exhibiting 'an utter indifference to or conscious

disregard for' safety.'"" See *Boim v. Holy Land Found. for Relief & Dev.,* 549 F.3d 685, 693 (7th Cir. 2008).

## B. Ocwen Engaged in Materially Deceptive Conduct

Ms. Saccameno's ICFA claim was for both unfairness and deception. The jury instructions did not separate those claims and Ocwen did not request a separate verdict to distinguish between unfairness and deception. Therefore, Ocwen cannot now claim that the jury did not find deception. Ocwen is bound to the law of the case set out in the jury instructions. See *Will v. Comprehensive Accounting Corp.,* at 675.

The record demonstrates Ocwen admitted deception on numerous fronts. Ocwen's intention that Ms. Saccameno rely on the deception is manifest by Ocwen's years-long assertion that its false statements were in fact true and its illegal collection practices were legal. See ¶¶46-49 supra. Every single document that Ocwen admits is false sought payment of money Ms. Saccameno did not owe and Ocwen had no legal right to collect. Those collection efforts were indisputably in violation of the bankruptcy discharge order entered on June 27, 2013.

## C. Ocwen Intentionally Disobeyed Multiple Valid Court Orders and Legal Obligations to Cause Ms. Saccameno Harm

Ocwen admitted receiving all of the filings from the Bankruptcy Court since September of 2011, including the discharge order. ¶¶4-5. "Litigants must live with the stories that they tell under oath." See *Escamilla v. Jungwirth,* 426 F.3d 868, 870 (7th Cir. 2005). All orders and judgments of courts must be complied with promptly. Persons who refuse to obey an order generally risk criminal

contempt. *Maness v. Meyers*, 419 U.S. 449, 458 (1975). Despite this admonition from the Supreme Court, Ocwen ignored the bankruptcy court's discharge order for years. Ocwen also ignored its obligations under the consent orders and decrees at D.E. 363 and D.E. 364 for years. Ocwen also ignored its legal obligation to comply with Rule 3002.1 of the Rules of Bankruptcy Procedure. A rule specifically intended to avoid this very scenario.

The decision to code Ms. Saccameno's loan as dismissed actually involved two very important issues which would have avoided this entire nightmare. The first was coding the loan as dismissed instead of discharged. The second issue also involves the document that Ocwen claims to have relied upon as a bankruptcy dismissal order: the bankruptcy court's Rule 3002.1 notice, the "Notice of Final Cure Payment." (D.E. 279, p. 123 and D.E. 356). ¶6. Ocwen acknowledges the importance of this document. ¶8. Ocwen admits no one working in bankruptcy should think this document involves the dismissal of a bankruptcy. ¶9. If Ocwen had handled this document correctly, any disputes about payments could have been resolved under the purview of the Bankruptcy Court as intended by the Rules, and all of Ms. Saccameno's harms could have been avoided in June of 2013. ¶¶23-25.

"Marla's Mistake" ties back to issues Ocwen had notice of for years, according to information in D.E. 364. Ocwen testified that coding the loan as dismissed conflicted with Ocwen's own business records, there was no document indicating Ms. Saccameno's case was dismissed, and anyone working in bankruptcy should have known the Rule 3002.1 notice was not a dismissal. ¶¶8-11. Coding Ms.

Saccameno's loan as dismissed can clearly be tied to Ocwen's obligation to "refrain from utilizing inadequate and ineffective information technology systems and personnel." ¶54.

A reasonable jury could take away from Ocwen's testimony on this issue two important facts: Ocwen continued to violate its legal obligations under D.E. 364 and, Ocwen had corporate knowledge of Ms. Saccameno's bankruptcy discharge on July 2, 2013. This evidence supports the proposition that "Marla's Mistake" was no mistake at all but an intentional choice so that collections could be restarted in violation of the discharge injunction. ¶¶8-15, 23-25, 29-34, 38-47.

Ms. Saccameno could be the poster child for the very reason the Rule 3002.1 notice system came into being. "Bankruptcy Rule 3002.1 (the "Rule") was promulgated in 2011, in response to a growing problem that had arisen in Chapter 13 cases throughout the country: debtors who had successfully completed their Chapter 13 plans, and paid all of their mortgage arrears and post-petition installment payments, would find themselves in renewed foreclosure proceedings due to undisclosed and unpaid post-petition charges and fees — a result clearly at odds with a debtor's right to a fresh start." *In re Gravel*, 556 B.R. 561, 568 (Bankr. D. Vt. Sept. 12, 2016).

"Under Rule 3002.1(g), the creditor is obligated to itemize all arrearages still due and owing if the creditor contends that the debtor has not made all post-petition payments." *In re Baca*, 2012 Bankr. LEXIS 5874, *13-14 (Bankr. D.N.M. Dec. 20, 2012). "The holder must indicate, in its response, whether (a) it agrees that

any defaults have been cured and (b) whether the "debtor is otherwise current on all payments consistent with § 1322(b)(5) of the Code." *In re Thibeault*, 2015 Bankr. LEXIS 3432, *4-6 (Bankr. D. Me. Oct. 8, 2015). Ocwen thwarted the normal operations and procedures of the Chapter 13 process by not responding to the Rule 3002.1 notice.

A reasonable jury could readily find that Ocwen made a deliberate choice to ignore both the Rule 3002.1 process and the discharge injunction to attempt to collect discharged debt from Saccameno. A reasonable jury could also infer that this is Ocwen's normal business practice given its testimony that Saccameno was not singled out (¶3) and that all of Ocwen's employees knew of the bankruptcy discharge no later than July 23, 2013 (¶27), yet Ocwen's conduct persisted for years (¶¶46-49) and Ocwen made no effort to determine the scope or severity of the problem, (¶¶50-53). Ocwen's lack of concern over this very harmful conduct correlates perfectly with Ocwen's failure to take actions Ocwen was legally obligated to take, as noted in D.E. 364.

The evidence supports the inference Ocwen intentionally ignored the bankruptcy discharge order to illegally extract money from discharged bankruptcy debtors. Ocwen's conduct could certainly be characterized as willful, reckless or intentional. Ocwen also intentionally ignored legal obligations imposed on it by its Consent Order with the NYDFS in D.E. 364. And, Ocwen intentionally ignored its legal obligations to put every loan in bankruptcy through a post-bankruptcy audit, as found in its agreement with the US and 49 States at D.E. 363.

### D. "Marla's Mistake" Inured to Ocwen's Benefit and Allowed Ocwen's System to Reengage its Automated Collections Processes

According to Ocwen, collections could not have continued without Ms. Saccameno's loan being coded as dismissed rather than discharged. ¶14. This miscoding also allowed Ms. Saccameno's account to avoid a post-bankruptcy audit or reconciliation. ¶13. If the jury credited Ocwen's statements about the efficacy of a bankruptcy reconciliation, this leads to another inference against Ocwen: that Ocwen intentionally refused to audit Ms. Saccameno's loan to pursue illegal collections. In this case, when Ocwen finally attempted to audit Ms. Saccameno's loan account, Ocwen still did not comply with the discharge order. In fact, Ocwen intentionally refused to raise the bankruptcy discharge flag in its system as explained in paragraphs 27-34.

"To prove that a discharge injunction has been violated, "the debtor must show that the creditor acted intentionally, with knowledge that his act was in violation of the automatic stay [or injunction].""" *Romanucci & Blandin, LLC v. Lempesis*, 2017 U.S. Dist. LEXIS 71526, at *12 (N.D. Ill. May 4, 2017). "A court may hold a creditor in civil contempt for violating a discharge order where there is not a "fair ground of doubt" as to whether the creditor's conduct might be lawful under the discharge order." *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019). Ocwen repeatedly admitted its conduct was in violation of the discharge injunction making sanctions under the new *Taggart* standard appropriate. See ¶¶5, 11-14, 27, 29, 33, 34, 37-49.

A reasonable jury could find that Ocwen's intentional violation of the discharge injunction order was an act of legal malice, or Ocwen was acting willfully,

or with such gross negligence as to indicate a wanton disregard of the rights of others. Ocwen also is imputed knowledge of the law including the fact that Ocwen can be sanctioned with punitive damages for violating the bankruptcy discharge injunction. See *Vazquez v. Sears, Roebuck & Co. (In re Vazquez)*, 221 B.R. 222, 231 (Bankr. N.D. Ill. 1998).

Ocwen also lied about when it raised the bankruptcy discharge flag in its system of record, ¶37. A reasonable jury was free to infer from Ocwen's testimony on this point that Ocwen knew its conduct was wrong and was attempting to hide its misconduct from the jury through false testimony. This would go to Ocwen's state of mind and intent, as well as Ocwen's credibility, or lack thereof, in front of the jury.

### i. "Miscoding" Ms. Saccameno's Loan Allowed Collections to Resume

Ocwen's choice to code Ms. Saccameno's loan as dismissed restarted full blown collections against Ms. Saccameno within days of her bankruptcy discharge. ¶¶12, 14-22. Had Ms. Saccameno bowed to Ocwen's pressure, she would have paid thousands to Ocwen to end its illegal collections.

### ii. "Miscoding" Ms. Saccameno's Loan Allowed Foreclosure to Resume

In addition to active collections, the coding Ms. Saccameno's loan as dismissed caused Ocwen's system to put Ms. Saccameno's loan account back in active foreclosure. ¶¶38-46. As noted, though Ocwen should have dismissed the foreclosure upon entry of the discharge, the foreclosure case was not dismissed for

almost three years following the discharge and more than a year after this lawsuit began.

### iii. Reasonable Inference of Intent to Harm

A reasonable jury could infer from these facts that Ocwen intentionally coded Ms. Saccameno's loan as dismissed to pursue collections in violation of the discharge injunction. A reasonable jury could also find that Ocwen had a pattern of intentionally ignoring its legal obligations and binding court orders even when Ocwen's conduct would result in harm to consumers.

### E. Ocwen Also Tried to "Cook the Books" with Its Payment History

Ocwen's records show that throughout the litigation Ocwen altered Ms. Saccameno's payment history numerous times. Ocwen's records would not allow the reviewer to determine what was changed. Despite this, Ocwen's records still showed thousands of dollars in misapplied payments from Ms. Saccameno and thousands in payments to Ocwen that were in violation of the bankruptcy discharge order. See ¶¶56-61. A reasonable jury could conclude Ocwen was altering evidence to cover up wrongdoing.

### i. Ocwen Cannot Count to 42

Ocwen maintained records demonstrating that Ms. Saccameno had made all of her 42 post-petition bankruptcy payments from the outset of this controversy. However, Ocwen could not count those 42 payments without the assistance of Ms. Saccameno's counsel on the second day of trial. ¶¶63-68. Ocwen acknowledged that all of Saccameno's harms could have been avoided if Ocwen had accurately reviewed

its records in July and August of 2013. A reasonable jury could infer that Ocwen willfully and intentionally chose to ignore its records to pursue illegal debt collection.

## F. Ocwen's Offers of Loan Modification Are Further Evidence of an Intent to Profit Illegally

Ocwen also argued at trial that it provided Ms. Saccameno two offers for loan modifications, See D.E. 353 and D.E. 354. Ocwen argues that these offers show Ocwen was not acting in bad faith or with intent to harm Ms. Saccameno. This argument ignores the reality contained in those offers. ¶¶72-74. Ocwen's modifications, if accepted, would have capitalized tens of thousands of dollars into Ms. Saccameno's loan balance Ocwen sought to collect illegally including amounts discharged in bankruptcy. A reasonable jury could infer from the terms of these modifications that Ocwen was persisting in its open defiance of the bankruptcy discharge order by seeking to collect discharged debt through the artifice of a loan modification.

## G. Ocwen's Arguments Regarding Deliberate Corporate Participation are Both Waived and in Contravention of the Law of the Case

Ocwen's last attack on the sufficiency of the evidence claims that punitive damages were improper because of a lack of evidence supporting a finding of "deliberate corporate participation." This argument is made for the first time on appeal and is therefore waived. See *Frey Corp. v. City of Peoria, infra*. Also, the argument has no merit because the law of the case is controlled by the jury's

instructions not Ocwen's reference to Illinois law. See *Hunt v. Chi. Hous. Auth.*, 1992 U.S. App. LEXIS 20161, at *36 (7th Cir. Aug. 19, 1992).

## II. Punitive Damages are Proper and the Amount Awarded is Well Within Constitutional Limits

The fundamental problem with Ocwen's constitutional analysis of the punitive damages award lies with Ocwen's inability to correctly determine the denominator for its ratio analysis. Ms. Saccameno was awarded punitive damages under ICFA. Ocwen's argument is that only $82,000 of the $582,000 compensatory award should be considered for the denominator in the ratio analysis of this case.

This Court can assume without deciding that Ocwen's argument is correct on this point and still resolve this case without considering Ocwen's constitutional arguments. This is because Ocwen has missed the actual outcome determinative issue. Ocwen failed to include the economic costs of this litigation in its analysis of the proper denominator. ¶79. Ms. Saccameno is free to argue this point as the Appellee. See *Washington v. Lane*, 840 F.2d 443, 445-46 (7th Cir. 1988). This question is controlled by the *Erie* Doctrine and Illinois law.

*Blount v. Stroud*, 395 Ill. App. 3d 8, 27 (2009) stands for the proposition that "the amount of attorney fees expended in a case may be taken into account when assessing the propriety of a punitive damage award." Multiple Courts have agreed that the economic cost of the litigation is relevant to factor into the ratio analysis. In accord are *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 136 (2008), *Int'l Union of Operating Eng'rs, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 490 (2006), and *Mathias* at 677. The Tenth Circuit also endorsed this approach holding "A rich

defendant may act oppressively and force or prolong litigation simply because it can afford to do so and a plaintiff may not be able to bear the costs and the delay.[…] Nothing in *BMW* would appear to prohibit consideration of the cost of those legal proceedings in determining the constitutionally permissible limits on the punitive damages award." *Cont'l Trend Res. v. Oxy USA*, 101 F.3d 634, 642 (10th Cir. 1996). Also, the *Erie* Doctrine compels this Court to follow Illinois precedent on this issue. See *Trans States Airlines v. Pratt & Whitney Can.*, 86 F.3d 725, 726 (7th Cir. 1996). By adding the economic costs of the litigation to the analysis, Ms. Saccameno's proper denominator is $832,000, not $82,000. The proper ratio is not 37:1 but 3.6:1. Ocwen cannot seriously dispute such a ratio comports with constitutional guidelines.

Ocwen engaged in a years-long pattern of ignoring its legal obligations set out in multiple binding Consent Orders and Judgments. ¶¶54-55. Ocwen persistently, intentionally, and blatantly ignored the bankruptcy court's discharge order for a period of years. ¶27. Ocwen admitted both that its mistakes were very serious and that its mistakes were easily avoidable. ¶¶12, 8-11, 28.

Ms. Saccameno lived four years and nine months of her life under a cloud of fear, stress, anxiety and deep worry that she would turn the corner to her home and all of her belongings would be on the street and she would be homeless. (D.E. 285, p. 780-781). Four years and nine months is 1,735 days or 41,640 hours of mistreatment at the hands of Ocwen. Divided by 40 hours, that is the equivalent of 1,041 40-hour work weeks. This is enough work weeks for a 20-year career. Every

second of that entire time Ocwen was hell-bent on grinding Ms. Saccameno into the dirt in its illegal efforts to collect discharged debt right into the teeth of this trial.

## A. The Disparity Between the ICFA Compensatory Damages Award and Punitive Damages is Not Irrational

Ocwen tries to frame this question as one of great constitutional import. This Court need not answer this question, however. As explained in the prior section, this Court can assume without deciding that it should exclude the $500,000 awarded at trial in the portion of the verdict form for the breach of contract, RESPA and FDCPA claims from its analysis and still reach a single digit ratio.

Ocwen agreed the economic cost of litigation through April 30, 2018 is $750,000. ¶79. Adding this number to the uncontested $82,000 and dividing yields a ratio of approximately 3.6:1. There can be no serious debate that single digit ratios comport with constitutional guidelines.

### i. Ocwen's Argument that Due Process Requires a "Claim by Claim" Analysis Rather than Aggregation Misses the Mark

Ocwen contrived a fact pattern to create a constitutional question where one did not previously exist. This Court is under no obligation to answer constitutional questions arising from Ocwen's attempts to game the system. In fact, this court should resolve this question on other grounds if possible and avoid unnecessary constitutional questions. *Beard* at 955. This is especially true here where Ocwen seeks to create a circuit split on this issue with authority cited from the Eighth Circuit.

There are three paths by which this Court can avoid answering the constitutional question Ocwen offers. First, the Court can "assume without deciding" Ocwen's position is correct and then factor the economic costs of this litigation in the denominator as discussed above. This would still render the ratio a low single digit multiplier and the question of aggregation would be irrelevant.

Second, this Court can bind Ocwen to the agreement its counsel made with Ms. Saccameno's counsel during trial that the "apportioned" compensatory damages would be added together for a total compensatory award. Third, the Court can apply an estoppel against Ocwen to prevent Ocwen from arguing the compensatory damages were properly apportioned since they could not be apportioned legally without Ms. Saccameno's consent. This is appropriate because Ocwen only obtained Ms. Saccameno's consent to the verdict form by agreeing that the compensatory amounts would be added together. Only if this Court does not agree that attorney's fees should be part of the proper denominator is there any need for the Court to consider any other argument on this point from Ms. Saccameno.

### ii. Ocwen's Due Process Argument for Claim by Claim Method does not have to be Decided

Ocwen created its constitutional question by reneging on its agreement with Ms. Saccameno that the various compensatory damages lines would be added together for a total compensatory award. This Court can and should bind Ocwen to that agreement or impose judicial estoppel against Ocwen to give effect to Ocwen's representations and agreements at trial with respect to the issue of compensatory damages.

### a. Ocwen Agreed that the Compensatory Damages Would be Totaled by the Court

The jury verdict form was illegal in the absence of the parties' agreement on its use. As a matter of law, compensatory damages cannot be apportioned among theories of relief. Ms. Saccameno was (and is) entitled to one award of compensation for her harms no matter how many theories she pursued against Ocwen. See *Duran v. Town of Cicero*, 653 F.3d 632, 640 (7th Cir. 2011) and *Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 900 F.3d 377, 383 (7th Cir. 2018). Also, "it's the judge's responsibility to get the verdict form right, not just pick one side's proposal or the other's." *Duran at* 642.

Thus, in the absence of an agreement between the parties, any jury verdict form that apportioned compensatory damages among theories of relief would violate this rule and would be an illegal verdict form requiring a new trial on damages.[2] *Duran at* 635. Since the Court is charged with giving an appropriate verdict form and the verdict form used would not be legal without Ms. Saccameno and Ocwen's agreement, the use of the verdict form is further evidence of the parties' agreement on this point.

The record also reflects the parties' agreement to resolve the verdict form dispute by Ms. Saccameno dropping her objections to Ocwen's verdict form in exchange for Ocwen's agreement that the multiple lines for compensatory damages would be added together. See discussion of the verdict form relevant to this issue at

---

[2] This is not to say that the verdict form for damages could not have itemized compensatory damages as between economic and non-economic. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 312-13, 315 (7th Cir. 2009).

D.E. 327, p. 1012-1019. At this time, the parties were stuck only on the form of the verdict for the ICFA count. Ocwen objected to the Plaintiff's verdict form because Ocwen insisted it was entitled to have the jury quantify economic damages. This objection was raised at D.E. 327, p. 1013.[3]

The district court pointed out that Ocwen's proposed verdict form on ICFA would impermissibly divide damages into multiple lines of the verdict form and that was improper. (D.E. 327, p. 1014-1015). Beginning at D.E. 327, p.1015, line 17, the Court gave Ocwen's counsel a specific hypothetical and asked him how the multiple lines of the verdict form should be treated. Ocwen's trial counsel indicated the lines should be added together. Ms. Saccameno's counsel confirmed Ocwen's position in a follow up question on the record. Ocwen again acknowledged the lines should be added. (D.E. 327, p.1016, lines 1-3).

At D.E. 327, p. 1016, line 23, the district court asked Ocwen's counsel about Ocwen's damages instruction on the other counts and after reviewing the document stated, "Oh, so you have actual damages twice and you have them separated."( D.E. 327, p. 1017). The district court asked Ms. Saccameno's counsel how he wished to proceed, "I mean, it's a mess. What do you want to do Mr. Wooten. I mean, the defendant solves this problem, but it raises another problem, which, you know, well, they'll just cut up. If they have damages on all these claims they'll just divide it." (D.E. 327, p. 1017). More discussion of the verdict form ensued. Ultimately, counsel for Ms. Saccameno then spoke off the record with Ocwen's counsel (D.E. 327, p.

---

[3] While line 1 of D.E. 327, p. 1013 references verdict form B, this is a transcription error, the form was actually verdict form D for the plaintiff relating to ICFA.

1019, counsel conferring) where Ocwen's trial counsel again confirmed his position that all lines should be added together for a total compensatory award. After Ocwen's counsel had confirmed this position *for the third time*, Ms. Saccameno's counsel then announced on the record that Ms. Saccameno would consent to the use of Ocwen's verdict form. (D.E. 327, p.1019).

Ms. Saccameno's counsel then argued to the jury, without objection from Ocwen, that the jury should split whatever amounts it decided *for compensation* between the verdict form for damages under the FDCPA, RESPA and Breach of Contract with the non-economic damages under the ICFA form with one-half on each line and "I don't want you to double count. Whatever you put right there for economic, don't include that in the next part where it talks about non-economic…That's what we asked you to order a total of 750 for. Now you know you got to split that into three places because that economic piece goes on a separate line[.]" (D.E. 327, p. 1057-1059). This is also significant because Ocwen argued for a defense verdict and took no position on the verdict form.

Further evidence of this agreement is the fact Ocwen never took the position at any point in the litigation through the completion of the trial that only compensatory damages awarded under the ICFA count could be considered when analyzing the punitive damages award or that compensatory damages should be apportioned between claims. Such a position would conflict with *Duran*. Had Ocwen ever clearly stated such a position, Ms. Saccameno could have considered other strategies to address this argument including proceeding to verdict only under the

ICFA count or refusing to agree to a verdict form that appeared to apportion damages between claims.

Now, in post-trial motions and on appeal, Ocwen takes the position that only a portion of the total compensatory damages awarded to Ms. Saccameno should be used in the ratio analysis of the punitive damages award in this case. Without this fabricated argument, Ocwen's position on appeal with respect to ratios and excessive punitive damages would be utterly frivolous.

To take this position in brief, Ocwen is reneging on the very agreement its trial counsel made and the district court confirmed when the decision was made to use Ocwen's verdict form. This is unacceptable gamesmanship. This Court should hold Ocwen to its agreement to add the lines of the verdict form together for a total compensatory damages award of $582,000. Ocwen should clearly be bound to the agreement of its counsel during the trial because these are the very types of agreements that courts expect lawyers to make "during the heat of battle" that have far-reaching implications for the parties. See *In re Marriage of Marr*, 202 Ill. Dec. 657, 660, (1994), *Link v. Wabash R.R. Co.*, 82 S. Ct. 1386, and *Smego v. Payne*, 854 F.3d 387, 396 (7th Cir. 2017).

If this Court allows Ocwen to continue to renege on its agreement with respect to the treatment of the verdict form, then Ms. Saccameno will be denied her constitutional right to have a jury determine her damages and Ocwen will have made a mockery of this proceeding.

### b. The Application of Estoppel is also Appropriate to Prevent a Perversion of Justice

It is necessary to restate the magnitude of this issue *in this case* to appreciate the import of Ocwen's gamesmanship. On the one hand, Ocwen does not contest the entire compensatory award of $582,000 to Ms. Saccameno. On the other hand, Ocwen's entire appellate argument is crafted around its reliance on a jury verdict form that could have never been legally presented to the jury without resolving Ms. Saccameno's objection by agreeing to add the lines for compensatory damages. It is abundantly clear from Ocwen's briefing that, in the absence of denying and abandoning its agreement regarding the verdict form, Ocwen would have no constitutional basis to attack the jury's verdict in this case. This is exactly the type of gamesmanship the application of estoppel seeks to avoid.

"Estoppel is an equitable concept, and its application is therefore within the court's sound discretion." *In re Cassidy*, 892 F.2d 637, 642 (7th Cir. 1990). Judicial Estoppel is a "doctrine designed to protect the integrity of the courts." *Id.* Courts "continue[ ] a practice of holding parties to their representations…. we think that the change of position on [a] legal question is every bit as harmful to the administration of justice as a change on an issue of fact." *Id.* Judicial Estoppel should be applied be applied "where intentional self-contradiction is being used as a means of obtaining unfair advantage." *Id. at 641.*

The application of judicial estoppel is appropriate in this situation. Ocwen's entire constitutional challenge to the jury's punitive damages award, both as to ratios and aggregation, arises out of the verdict form. Ocwen overcame Ms.

Saccameno's objection to its otherwise illegal verdict form by agreeing to add the compensatory damages lines together. Now, Ocwen forsakes that agreement to make a constitutional attack on an otherwise unassailable jury verdict.

This is exactly the type of situation that calls out for the application of an estoppel. Otherwise Ocwen will have perverted the orderly administration of justice Ms. Saccameno deserves and this Court expects. Resolving Ocwen's appeal by binding Ocwen to its agreement regarding the treatment of the verdict form or by application of an estoppel to Ocwen's arguments relieves this Court of consideration of the constitutional question Ocwen has presented and does justice as between the parties.

### iii.   Discussion of Ocwen's Constitutional Analysis

Beginning at Page 35 of its brief, Ocwen devotes seven pages of argument to its position that it was unconstitutional for the district court to aggregate compensatory damages for its punitive damages analysis. Ocwen asks this Court to answer a constitutional question this Court need not resolve to determine this appeal. Ms. Saccameno agrees that there does not appear to be a significant amount of jurisprudence on this question and certainly no clear guidance in this Circuit. Ms. Saccameno's position is well known. The only reason this issue is on appeal is because of Ocwen's duplicity regarding the verdict form.

Constitutionally, the law in this Circuit is clear. "The trial judge has a responsibility to uphold the seventh amendment and must make every reasonable effort to sustain the jury verdict [...]" *Strauss v. Stratojac Corp.*, 810 F.2d 679, 683

(7th Cir. 1987). The Court is also free to "cumulate apportioned damages" to reflect the jury's intent in light of the instructions the jury was given and the verdict form that was used. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 311-12 (7th Cir. 2009).

Ocwen looks to *United States ex rel. Pileco, Inc. v. Slurry Systems, Inc.*, 804 F.3d 889 (7th Cir. 2015) for support for its position indicating that Judge Posner had endorsed a "claim-by-claim" approach. However, *Pileco* did not expressly forbid accumulation for ratio purposes. In *Pileco* there was no compensatory award for the *ICFA* violation. Therefore, Judge Posner reasoned, there had been no harm on the ICFA claim (including no economic loss). Under well-accepted jurisprudence there could be no punitive damages under the ICFA claim. *Pileco* did not say that a court could not accumulate damages. *Pileco* is better understood as acknowledging the universally accepted rule that punitive damages under the ICFA are not available without actual damages. Ms. Saccameno reiterates her position that this Court should not answer this constitutional question because resolution of this question is not necessary to resolution of this case.

### iv. Ocwen's Ratio Arguments at Points 3 and 4 Continue to Miss the Point

Ocwen continues to push its argument that the ratio this Court should consider is 37:1 instead of 3.6:1 because Ocwen fails to consider the attorney's fees awarded by the Court, with Ocwen's agreement, in the denominator of its ratio analysis. If Ocwen had determined the proper denominator it would not have made

this argument. To the extent Ocwen attempts to construe past precedent as requiring a remittitur to a 1:1 ratio, this argument is completely devoid of merit.

Juries determine damages, not Judges. Even if this Court determined the punitive damages were excessive, its only choice is to order remittitur and give Ms. Saccameno the choice of a new trial on damages. *McKinnon v. Berwyn*, 750 F.2d 1383, 1392 (7th Cir. 1984). "The judicial function is to police a range, not a point." *Mathias* at 678. Ocwen argues Ms. Saccameno's compensatory award "contains a punitive element" and that these damages are "punishment" of Ocwen. This argument is waived having been raised for the first time on appeal. See *Frey Corp. v. City of Peoria,* 735 F.3d 505, 509 (7th Cir. 2013). If the Court were inclined to consider this argument it should be summarily rejected because of the presumption that the jury followed their instructions and therefore clearly separated compensatory damages from punitive. *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008).

Ocwen also argues that even if the Court considers the entire $582,000 in its analysis that a 5:1 ratio would exceed constitutional bounds. This argument is borderline frivolous. See *Mathias, infra.* Ocwen has also waived this argument as well by raising it for the first time in this brief. See *Frey,* infra. Lastly, Ocwen is not entitled to categorize for purposes of argument its view of Ms. Saccameno's damages as not resulting from trauma. There is ample evidence in the record both from Ms. Saccameno's treating physician and several lay witnesses that this experience was quite traumatic and caused sufficient harm to require medical treatment. ¶¶75-77.

Lastly, remitting the jury's award as excessive when single digit multipliers are at issue clearly infringes upon Ms. Saccameno's seventh amendment right to have a jury determine her damages.

## B. Ocwen's Conduct Was Reprehensible

Ms. Saccameno laid out pages of evidence supporting a finding that Ocwen's conduct was reprehensible in her "statement of the case from the record evidence" supra, and incorporates that evidence by reference here. Suffice it to say that engaging in a pattern of ignoring court orders binding on a corporate defendant merits the harshest possible sanctions and is reprehensible. The law is clear ""[a] command to the corporation is in effect a command to those who are officially responsible for its affairs." *Wilson v. United States,* 31 S. Ct. 538 (1911)." *Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 417 (7th Cir. 1995). All orders and judgments of courts must be complied with promptly. Persons who refuse to obey an order generally risk criminal contempt. *Maness, supra.*

Further, Ocwen's arguments improperly ignore the jury charges, the presumptions that attach to those charges, and the resolutions of fact in dispute in favor of Ms. Saccameno. Beginning at D.E. 328, p. 1167, the jury was told to consider three questions in arriving at their decision to award punitive damages and the amount. These instructions were given without objection. They are the law of the case and the jury is assumed to have followed them and applied them to the facts as found. See *McRoberts,* 569 and *Hunt v. Chi. Hous. Auth.* *36. All Ocwen can argue at this point is that the jury did not perform their function. Ocwen may not

interject other grounds for determining punitive damages. Ocwen does not even argue the standards contained in the jury instructions and Ocwen's arguments on this point should be considered waived. In the event the Court considers Ocwen's arguments here, Ms. Saccameno has addressed them in the following paragraphs.

### i.    Ms. Saccameno Suffered Physical Harm

Ms. Saccameno's primary care physician testified without contravention that Ms. Saccameno suffered from depression, anxiety and panic disorders requiring medication for a period of years after Ocwen's conduct began. Ms. Saccameno's physician described her depression as "melancholy," like the type of depression one would experience after the death of a loved one. ¶75. Ms. Saccameno's trauma was corroborated by multiple witnesses who testified to the impact of Ocwen's conduct on Ms. Saccameno without objection. ¶77.

### ii.    Ocwen's Conduct Evinced an Indifference to or Reckless Disregard of the Health and Safety of Others

Ocwen's conduct clearly evinced an indifference to or reckless disregard of the health and safety of others. Ocwen knew if it was successful in carrying out its multiple separate acts of unfairness and deception, they would result in Ms. Saccameno losing her home or paying thousands of dollars in an illegal windfall to Ocwen. ¶12. Ocwen tormented Ms. Saccameno with illegal collection activity for 1,735 days. ¶27. Ocwen's conduct was in direct and continuing defiance of the bankruptcy discharge order. ¶¶4-5,11. Ocwen admitted many times that if it had properly handled Ms. Saccameno's mortgage account, nothing she experienced over the four year and nine month period would have occurred. ¶¶14, 23-25, 28, 38, 40-

49. Ocwen failed to investigate "Marla's Mistake" to determine if it happened once or a million times, despite having notice of significant and systemic problems with its mortgage servicing system of record. ¶¶50-55.

The jury was free to reject Ocwen's position based upon plentiful evidence from which the jury could reasonably infer everything Ocwen did was intentional. This is true right down to the testimony of Ocwen through its corporate representative, which was evasive, avoided simple answers to direct questions and was repeatedly proven to be false or deceptive. ¶¶16-17, 33, 35, 37, 47, 52, 53. Ocwen's conduct denied Ms. Saccameno a normal life for four years and nine months. ¶76.

### iii. Ms. Saccameno was Financially Vulnerable

As noted, Ms. Saccameno had just completed her Chapter 13 bankruptcy and received her discharge when her problems with Ocwen began. Ms. Saccameno testified without contravention she was financially vulnerable. ¶78. Ocwen seems to concede that Ms. Saccameno was financially vulnerable in brief but claims that Ocwen did not "reprehensibly exploit" Ms. Saccameno's financial vulnerability. This position is contrary to the voluminous record evidence already discussed throughout this brief. This factor is at the heart of this case, not tangential to the case, and the jury resolved this question against Ocwen.

### iv. Ocwen's Conduct Involved Repeated Actions

The jury rejected Ocwen's attempt to cast this case as a simple matter of "Marla's Mistake." The evidence demonstrated an overarching level of systemic

failure to comply with the law and Ocwen's legal obligations. Ocwen admitted hundreds of discrete actions taken against Ms. Saccameno in violation of law, see generally, "statement of the case from the record evidence" supra.

D.E. 364 noted as of December of 2014 almost three million consumer mortgage loan accounts were serviced by Ocwen. Ocwen testified it did not specifically target Ms. Saccameno. ¶3. D.E. 364 indicated Ocwen's systems included inadequate infrastructure and ineffective personnel that provide incorrect information and maintain inaccurate records and that Ocwen lacked controls to catch and resolve all of the errors in its system. A reasonable jury was free to infer from this evidence that application of Ocwen's normal systems, policies and procedures was likely to cause harm to every consumer for whom Ocwen was the mortgage servicer.

Ocwen argues in reliance on *Chicago Title* that Ms. Saccameno had to prove similar reprehensible conduct committed against various different parties rather than repeated acts against her. However, *Gore* does not categorically require evidence of misconduct against others. The *Gore* Court noted that "evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." See *BMW of N. Am. v. Gore*, 116 S. Ct. 1589, 1599 (1996). Here the jury had evidence of a multi-year failure to comply with its legal obligations under D.E. 364 affecting millions of consumers, evidence of a failure to comply with going forward

legal obligations under D.E. 363, and a multi-year failure to comply with the bankruptcy discharge order as to Ms. Saccameno. This is more than sufficient evidence to show repeated misconduct and recidivism. *Gore* also acknowledged recidivists should be punished more severely than a first offender. The evidence supports Ocwen's status as a recidivist.

### v. Ms. Saccameno's Harm was the Result of Intentional Malice, Trickery or Deceit

Ocwen argues that no evidence exists of intentional malice, trickery or deceit. The jury rejected Ocwen's position and testimony on this point. As noted, "Marla's Mistake" could only be blamed for 20 of the first 30 days of 1,735 days of continuous and flagrant lawlessness. Everything that happened to Ms. Saccameno was easily avoidable. Ocwen admitted to numerous false communications and Ocwen persisted in claiming a right of collection and foreclosure where none existed for a period of years all the way into the second day of this trial.

### C. Civil Penalties Are Comparable To The Punitive Damages Award

"Section 7 of the Consumer Fraud Act authorizes the imposition of a civil penalty of up to $ 50,000 per violation when relief is sought by the Illinois Attorney General or a State's Attorney. 815 ILCS 505/7 (West 1996)." *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 136-37 (2008). Ocwen acknowledges that penalties can be assessed per violation for a party who acts with intent to deceive. Ocwen declares itself free from such intent. However, the evidence must be viewed in the light most favorable to Ms. Saccameno. *Marshall v. Teske,* 284 F.3d 765, 770 (7th Cir. 2002).

Ocwen's argument that it lacked intent to defraud is without merit. The jury determined this issue adversely to Ocwen. To so find, the jury had to determine Ocwen intended that Ms. Saccameno rely on Ocwen's deception. (D.E. 328, p. 1157). Since the jury found against Ocwen on the ICFA count this Court is free to consider the relationship between the civil penalties on a per violation basis.

All of Ocwen's actions arose out of its failure to properly process a bankruptcy discharge order. Every communication with Ms. Saccameno seeking to collect improperly can be counted as a violation for the purposes of this analysis. In the "statement of the case from the record evidence" supra, Ms. Saccameno laid out well over one-hundred discrete instances where Ocwen either attempted to collect a debt in violation of the discharge or provided false or inaccurate communication to Ms. Saccameno.[4] On a per violation basis, the jury could have awarded more than two million additional dollars to reach Ocwen's ICFA liability if pursued by the attorney general or a state's attorney.

Ocwen's argument that the district court was wrong to consider the RMLA and the potential cost of Ocwen losing its license to operate in Illinois is an interesting choice. Mindful that this Court may take judicial notice of facts not subject to reasonable dispute at any time, Ocwen's license was *actually suspended* by the State of Illinois on April 20, 2017 for very similar issues.[5] The State noted in its findings of fact numerous violations of law and numerous substantiated

---

[4] This number can be reached by counting all of the communications containing falsehoods such as statements, letters, responses to Qualified Written Requests, phone calls and communications with counsel for Saccameno (Ms. Van Sky), as well as discrete decisions not to properly process the bankruptcy discharge.

[5] https://www.idfpr.com/Banks/RESFIN/Discipline/2017/2017-MBR-CD-01.pdf

complaints connected to *RealServicing* and deficiencies within that system. See

*Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) (finding judicial notice appropriate

for decisions of administrative agencies outside the federal system).

There are numerous verdicts for similar amounts for similar conduct

including a few against Ocwen. In April of 2015, in the same courthouse, Ms.

Saccameno's counsel obtained a $2,000,000 verdict on nearly identical theories, in

the case of *Hammer v. Residential Credit Solutions, Inc.*, 2015 U.S. Dist. LEXIS

162636, (N.D. Ill. 2015) (The damages were $500,000 compensatory and $1,500,000

in punitive damages). In *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d

1282, 1287 (11th Cir. 2018) the Eleventh Circuit affirmed $6,000 in economic

damages and $500,000 in emotional distress damages, and $3,000,000 in punitive

damages for similar conduct. In *Guzman v. Ocwen Federal Bank, et al.* (03-CV-

61011-2, Nueces County, TX), a jury found Ocwen Federal Bank (Ocwen's

predecessor) guilty of malfeasance and criminal conduct and awarded Guzman $3

million. *Sealy Davis v. Ocwen Federal Bank, et al.* (04-CV-1469, Galveston County,

TX, November 29, 2005), a Galveston, Texas jury awarded $11.5 million to Davis

($10 million in punitive damages and $1.5 million for mental anguish and economic

damages) on claims that Ocwen committed fraud, demanded additional money and

started foreclosure improperly. In *Daugherty v. Ocwen Loan Servicing, LLC, 2016

U.S. Dist. LEXIS 159586, at \*3 (S.D. W. Va. Oct. 12, 2016)*, the jury returned a

verdict finding Ocwen liable for willfully violating the FCRA, and awarding

$6,128.39 for compensatory and $2,500,000 for punitive damages. Later reduced by

the 4th Circuit to $600,000, a 100:1 ratio at *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 261 (4th Cir. 2017)**.** In *Norman v. Deutsche Bank National Trust Co. and Ocwen Loan Servicing, et al.* (Yellowstone County, Montana District Court, November 2015, Case Number DV 12-1638), the Montana jury awarded the Normans $450,000 in compensatory damages and $1.6 million in punitive damages against Ocwen related to mishandling a foreclosure. In *Brash v. PHH* (U.S.D.C., M.D. Georgia Case No. 4-09-CV-146 (CDL) March 21, 2011), the jury awarded a $21 million verdict: $1 million for emotional distress damages; $575 other compensatory damages; $350,000 attorney's fees; and $20 million in punitive damages. In *Linza v. PHH* (Yuba County, CA, July 18, 2014), the Yuba County Superior Court jury awarded Linza $16.2 million in damages ($514,000 in compensatory damages and $15.7 million in punitive damages) after PHH bungled his loan modification and threatened to foreclose despite Linza's performance under the loan modification. In *Sundquist v. Bank of Am., N.A.*, 566 B.R. 563 (Bankr. E.D. Cal. 2017) (vacated by parties settlement), the Bankruptcy Court awarded actual damages in the amount of $1,074,581.50 and punitive damages of $45 million for violating the automatic stay. Ocwen's position here is completely without merit.

### D. Ocwen Cannot Define the Constitutional Limit of Punitive Damages

Ocwen argues this Court should determine the maximum amount of punitive damages Ms. Saccameno may be awarded as a matter of law. In *McKinnon* this Court held "[t]he Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury." Since *McKinnon,* both *Adams* and *Beard*

have rejected the very position Ocwen advances. This case offers no reason to upset this precedent.

## CONCLUSION

Ocwen was roundly beaten at trial. Its constitutional arguments here are contrived. Ocwen also fails to acknowledge settled law that ignoring court orders is punishable by criminal contempt. The Court should take the simple, direct and correct path to affirm the verdict in full. The Court can do this by assuming without deciding that Ocwen's position is correct that only $82,000 of the verdict should be counted and then adding the $750,000 in economic costs of the litigation to reach a denominator of $832,000 and a ratio of 3.6:1. This path also avoids unnecessary constitutional litigation and the unpleasantness of calling out Ocwen for ignoring its counsel's agreements at trial to contrive its constitutional arguments on appeal.

Respectfully submitted,

*/s/ Nick Wooten*
Nick Wooten
NICK WOOTEN, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
Email:  nick@nickwooten.com

*Attorney for Appellee Monette E. Saccameno*

Dated:  July 17, 2019

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) and Circuit Rule 32(c) because this brief contains 13,967 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), as well as the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 12-point font.

Dated: July 17, 2019

*/s/ Nick Wooten*
Nick Wooten

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2019, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Seventh Circuit via the CM/ECF system and further certify that all participants in this case are registered CM/ECF users and were served via the CM/ECF system.

*/s/ Nick Wooten*
Of Counsel